**FIAILOA & TUNA of Leone, Plaintiffs**

**v.**

**SAISELU MEREDITH of Leone, Defendant**

## No. 10-1940

## High Court of American Samoa

Civil Jurisdiction, Trial Division

[Land: "Siasiaga" in Iliili]

## February 21, 1941

ARTHUR A. MORROW, *Chief Justice;* LIUFAU, *Associate Judge;* and MALEPEAI, *Associate Judge.*

Heard at Fagatogo on Tuesday, January 21, 1941 at 9:00 A.M.

Mapu for Fiailoa & Tuna; Teo & Aumavae for Saiselu Meredith.

MORROW, *Chief Justice.*

On July 20, 1940 Saiselu Meredith applied to the Registrar of Titles to have the land Siasiaga registered as her individual property. A survey was filed with the application. On August 29, 1940 Fiailoa and Tuna filed an objection to such proposed registration claiming that Siasiaga was the communal family land of the Lemeanai family. Hence this litigation. Sec. 74 of the Codification.

Saiselu is the present holder of the title Lemeanai. The Lemeanai family and the Salemeanai are one and the same.

The evidence without dispute showed that before the Government of American Samoa was established in 1900 Siasiaga was given by the Aitulagi people to the father of Saiselu. The cession of the American Samoan Islands to the United States in 1900 did not affect the title. *Talo v. Poi,* No. 16-1937; *Salavea L. v. Ilaoa,* No. 2-1938. The principal dispute in the case (and the point upon which decision hinges) was whether Saiselu's father took

the land as his own individual property or in his capacity as the holder of the Lemeanai title.

To sustain her claim Saiselu testified that the Aitulagi people gave her father the land as an individual and that he gave it to her, both events occurring before the establishment of the Government in 1900. However, Saiselu admitted that she had no personal knowledge as to the capacity in which her father took the land. Her testimony, as she admitted, was based upon hearsay.

Also to establish her claim Saiselu put Alapa of Aitulagi upon the stand. Alapa is 67 years old and familiar with the land Siasiaga. It is clear from his testimony that the Aitulagi people gave the land to the title Lemeanai. In response to queries as to whether the land was taken by the Lemeanai as his own individual property or as family land, he testified that it was given to the title Lemeanai, and that "it would become communal property then."

Taking his testimony as a whole we are convinced that the land was given not to Saiselu's father as an individual but to her father in his capacity as the holder of the title Lemeanai and that it accordingly became the communal family land of the Lemeanai family.

To establish their claim that the land was the communal family land of the Salemeanai family, the objectors proved that it had been used by members of that family (and not others) ever since it was converted from bush land into agricultural land a few years after 1900. This proof was not disputed by Saiselu.

It appeared that Pauga (the true father of the objectors) entered on the land, at that time bush, shortly after the Government was established and put in plantations; that he so used the land until his death about 1920; that after his death the land had been used by his widow, the two objectors, their brother and a younger sister. Aumavae, a Salemeanai family member, also had a house and

plantations on Siasiaga for some time during the past decade, but he moved away a few years ago and ceased to cultivate the part of the land used by him for plantations. Saiselu herself had the use of a mulberry patch on Siasiaga for about a month about a year and a half ago. We think it clear from the evidence that the occupancy and use by the objectors and the other members of the Salemeanai family has been with the permission of Saiselu. The use and occupation by the objectors as well as the others with the permission of Saiselu is consistent with the property being either the individual property of Saiselu or the communal family land of the Salemeanai family, for Saiselu is the Lemeanai and if the land belongs to the title Lemeanai, as we think it does, her permission would be required by Samoan custom.

In view of all of the testimony, and particularly of the testimony of Alapa, a witness for Saiselu, that the property was given by the Aitulagi to the title Lemeanai and having been so given it "would be communal property," we conclude that Siasiaga should be registered as the communal family land of the Salemeanai family.

■ To avoid any dispute regarding the rights of the objectors to the occupancy and use of the land, we shall now give consideration to the legal effect of Saiselu's giving permission to them to have such use and occupancy. Saiselu herself testified that there was "no limit" to the time she gave the objectors the right to live on Siasiaga; and in response to the question "When you gave them permission did you intend to lead them to believe they could live on that land as long as they live" she answered: "That was my intention if they wanted to continue on the land it was alright." But taking her testimony as a whole and the other evidence we are convinced that the permission given covered such period as they might occupy or use the land, to continue so long as the objectors might live, if they

132

should use it so long. We think also that it was not the intent of Saiselu that the right of one objector should be terminated by one of them ceasing to make use of Siasiaga.

We think also that the permission given by Saiselu to the objectors does not bind subsequent holders of the Lemeanai title; that the use of the land by the objectors after Saiselu's death will be subject to the permission of Saiselu's successor, or successors, in the Lemeanai title. Such seems to be the Samoan custom and we must assume that both Saiselu and the objectors had it in mind when the foregoing permission was given. There was no evidence to the contrary.

■ The right to the use and occupation of family land by a member of a Samoan family pursuant to permission of the matai is now governed by the Codification. Sec. 3(1) of the Codification of the Regulations and Orders for the Government of American Samoa reads as follows:

"Such laws of the United States as shall by their own force be in effect in American Samoa together with the Regulations and Orders for the Government of American Samoa promulgated by the Governor and not inconsistent therewith and so much of the common law of England as is suitable to conditions in American Samoa and not inconsistent with either such laws of the United States or such Regulations and Orders are declared to be in force in American Samoa."

■ It is true that the establishment of the Government and the extension of the jurisdiction of the United States to these islands did not affect private land titles. But the effect of permission to use and occupy land followed by building a fale and putting in plantations in reliance upon such permission given subsequent to the establishment of the Government is determined by the common law of England, since there is no law of the United States or regulation or order promulgated by the Governor of American Samoa touching the matter. The common law of England

133

(which incidentally is the basic law in 47 of the 48 States in the U.S.) is on this matter suitable to conditions in American Samoa.

■ "The general rule is that a parol gift of land, accompanied by possession by the donee, will be enforced in equity, when the donee has been induced by the promise of the gift to make valuable improvements to the land, of a permanent nature, and to such an extent as to render a revocation of the gift unjust, inequitable, and a fraud upon the donee. Such a state of facts will . . . entitle the donee . . . to defend his possession against the donor or his heirs." 28 Corpus Juris 656. This statement of the law in Corpus Juris is sustained by a multitude of decisions of courts of last resort in the United States. It is a correct statement of the common law.

■ We think the evidence shows an oral gift of an interest in Siasiaga by the Lemeanai which gift was relied on by Fiailoa and Tuna in putting up a house on the land and putting in plantations. Under such circumstances their rights in the land cannot be terminated by the mere whim of the Lemeanai. She must abide by the terms of the gift, it having been relied upon by Fiailoa and Tuna. It appeared from the testimony of Fiailoa that she is no longer using the land but is living with her husband, a matai, in Leone. Therefore her rights in the land resulting from the aforementioned permission are at an end. Tuna's right to the occupancy and use of the land will terminate upon her ceasing to occupy and use it, or upon the death of the present Lemeanai whichever first occurs. However, should the present Lemeanai's death occur during Tuna's use or occupancy, Tuna will have a reasonable time thereafter to remove the buildings, and plantations. If Tuna's use and occupancy, or of either of them, continues to the death of the present Lemeanai any further such occupation or use thereafter will, except as stated in the next preceding sen-

134

tence, depend upon the permission of the next Lemeanai since Saiselu as the Lemeanai did not intend (and probably could not although we make no determination on this point) to bind her successors in the title.

Since Fiailoa and Tuna were given the right to use and occupy Siasiaga together it follows that the right of each was the right to occupy and use an undivided half of the land. Since Fiailoa's rights have come to an end it follows that the holder of the title Lemeanai—now Saiselu—has the right which Fiailoa formerly had, i.e. the right to use and occupy an undivided half subject to applicable provisions in the decree.

To avoid further disputes and to settle the entire controversy:

IT IS ORDERED, ADJUDGED AND DECREED that the land Siasiaga be registered as the communal land of the Salemeanai family subject (1) to the right of Tuna to occupy and/or use that half of the land toward the Naval Station so long as she may continue to occupy and/or use said half, but not beyond the lifetime of Saiselu but with the right, should Tuna's occupancy and/or use continue until the death of Saiselu, to remove the buildings and plantations within a reasonable time after such death, and (2) subject to the right of Tuna to remove any plantations she may have on the half of Siasiaga toward Leone, the right of removal to continue for six months.

In explanation of the particular division made by the decree the court observed at the time it visited the land prior to hearing the case that the house built upon Siasiaga by the objectors stood on the half toward the Naval Station.

Costs in the sum of $12.50 are hereby assessed against Saiselu and a like amount against Fiailoa and Tuna, the same to be paid within 60 days.